J-S41008-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: A.E.L.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 436 MDA 2020 |

Appeal from the Decree Entered February 24, 2020,
in the Court of Common Pleas of York County,
Orphans' Court at No(s): 2018-0125a.

| | | |
|---|---|---|
| IN THE INT. OF: T.M.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 437 MDA 2020 |

Appeal from the Decree Entered February 24, 2020,
in the Court of Common Pleas of York County,
Orphans' Court at No(s): 2019-0193a.

| | | |
|---|---|---|
| IN THE INT. OF: A.E.L.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 438 MDA 2020 |

Appeal from the Decree Entered February 24, 2020,
in the Court of Common Pleas of York County,
Orphans' Court at No(s): 2019-0194a.

IN THE INT. OF: A.E.L.L., A MINOR : IN THE SUPERIOR COURT OF
                                   :          PENNSYLVANIA
                                   :
APPEAL OF: T.L., MOTHER          :
                                   :
                                   :
                                   :
                                   :
                                   :          No. 439 MDA 2020

Appeal from the Decree Entered February 24, 2020,
in the Court of Common Pleas of York County,
Orphans' Court at No(s):  2019-0195a.

BEFORE:   KUNSELMAN, J., McLAUGHLIN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY KUNSELMAN, J.:          **FILED NOVEMBER 19, 2020**

In these consolidated matters, T.L. (Mother) appeals from the decrees involuntarily terminating her rights to four children – 11-year-old A.L. (born 2008); 10-year-old A.L. (born 2010); 6-year-old A.L. (born 2013); and 5-year-old T.L. (born 2014) – pursuant to the Adoption Act. *See* 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).[1]  After review, we affirm.

The relevant history is as follows:

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court also terminated the rights of T.L. (Father), who is the parent of A.L. (born 2010), A.L. (born 2013), and T.L. (born 2014).  His consolidated appeal is separately listed before this panel. *See* 545, 546, and 547 MDA 2020.  The orphans' court also terminated the rights of R.V., the biological father of A.L. (born 2008); he did not appeal.  Also separately listed before this panel is Mother's appeal of a prior permanency review order. *See* 1954, 1953, and 1955 MDA 2019.  Given the subsequent terminations of Mother's rights, which are at issue in this memorandum, we dismissed that appeal as moot.

The family came to the attention of the York County Office of Children Youth and Families (Agency) in June 2017 following allegations that Mother physically abused A.L. (2008) in a parking lot, and that Mother was abusing drugs. The court consequently removed A.L. (2008) from Mother's care and adjudicated the child dependent. The three younger children remained with Mother.

In December 2017, the family again came to the Agency's attention, following allegations Father abused T.L. (2014) by rubbing the boy's face in a mess he made, hitting him, and throwing him into a bathtub. The child sustained injuries, and the court eventually found T.L. was a victim of abuse under 23 Pa.C.S.A. § 6303.[2] There was also domestic violence between Mother and Father. In January 2018, the Agency filed an application for emergency protective custody, and the court removed the children from Mother's care. The court adjudicated the children dependent.

The Agency developed a family service plan to aid in the reunification of the family. Although Mother generally cooperated with the Agency, the dependency case lingered in large part due to Mother's inability to deal with the children's advanced behavioral issues. All of the children were diagnosed with disorganized attachment disorder due to their developmental trauma and

---

[2] It was also alleged Father sexually abused A.L. (2013) and A.L. (2010), but evidently the court was satisfied that there was no reason to pursue these allegations. We only mention them insofar as they were the impetus for the children's removal.

neglect. By December 2019, the children had been placed outside of Mother's care for approximately two years, and the Agency petitioned for termination.

The court held termination hearings over the course of three dates, February 19-21, 2020. Following the hearing, the orphans' court issued findings from the bench and terminated Mother's rights. **See** Trial Court Opinion (T.C.O. 1), 2/21/20 at 1-17. The orphans' court issued decrees on February 24, 2020. Mother timely-filed this appeal, and the court issued a second opinion pursuant to Pa.R.A.P. 1925(a). **See** Trial Court Opinion (T.C.O. 2), dated 3/30/20, at 1-9.

On appeal, Mother presents a considerably broad question:

> Did the lower court abuse its discretion and err as a matter
> of law as the Agency failed to meet its burden to terminate
> Mother's parental rights?

Mother's Brief at 5.

Notwithstanding Mother's vague question presented, her Brief largely corresponds with the specific points she raised in her Rule 1925(b) concise statement of errors such that we may discern her arguments on appeal. In essence, Mother appeals the sufficiency of evidence for each subsection upon which the court terminated Mother's rights. **See** 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8) and (b).

We review these claims mindful of our well-settled standard or review:

> The standard of review in termination of parental rights
> cases requires appellate courts to accept the findings of fact
> and credibility determinations of the trial court if they are
> supported by the record. If the factual findings are

supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotations marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in

- 5 -

issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation and quotation marks omitted).

In this case, the court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b).[3]  We need only agree with the court as to any one subsection of 2511(a), as well as Section (b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  We begin with the first prong of the termination analysis under Section 2511(a). Specifically, we analyze the court's decision under Section 2511(a)(2).

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> [...]
>
> (2)  The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Regarding Section 2511(a)(2), we have explained:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or

---

[3] We note that neither the petitions for termination, nor the resulting decrees identified the specific, enumerated sections under Section 2511(a) upon which termination was granted.  Instead, the Agency listed the text of the subsections that correspond with 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). Likewise, the resulting decrees simply granted the petitions.

refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (citations, internal quotation marks, and indentation omitted).

Regarding Section 2511(a)(2), Mother limits her argument to the third element; whether Mother can remedy her inability to parent. *See* Mother's Brief at 37-40. For support, Mother contends that she accomplished every family service goal asked of her during the dependency case.

The orphans' court acknowledged Mother's general compliance, but it opined that focusing on her compliance alone misses the broader point. The court determined Mother had not remedied her inability to parent the four children, who have experienced trauma and have resulting behavioral issues:

[T]he [c]ourt does not feel that Mother at any time has not been cooperative, but we have to label cooperation differently from progress. Mother has come a long way, but she had a long way to come. She has not come far enough that she can parent a child [referring to A.L. [2008)] whose memory of being in her home was of being hit and taking care of her siblings, nor can she address the trauma faced by the other children.

*See* T.C.O. 1, at 7.

The court also opined:

> This [c]ourt disagrees that the initial reasons for placement have been remedied as there are still significant concerns for the [c]ourt. Specifically, the [c]ourt has concerns regarding the emotional and physical safety of the children stemming from the abuse and the neglect that resulted in the children being placed. Mother's main problem is that, after 24 months in placement and significant services, Mother's visits were still supervised. For the past 12 months, Mother's able counsel has argued that she is always on the cusp of accomplishing her goals, yet she has always failed to actually have a present ability to assume custody. Despite extensions of time and substantial services, Mother has been unable to implement and demonstrate the parental capacity and [judgment] necessary to ensure the children's physical and emotional safety even for brief periods of visits. Overall, Mother would have the [c]ourt look at her individual accomplishments in certain areas without a view towards the bigger picture whether she can parent now.

T.C.O. 2 at 3-4.

With minimal citations to either the record or legal authority, none particularly relevant to the question of whether Mother can remedy her inability to parent, Mother essentially argues that the service providers' testimony lacked credibility and thus should have been given limited weight. *See generally* Mother's Brief at 37-39. To that end, we observe that appellate courts "are not in a position to make close calls based on fact-specific determinations," particularly in termination cases where the lower court judge, who presides over multiple hearings with the same parties, possesses "a longitudinal understanding of the case." *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). And as we stressed above, we do not second-guess the court's credibility determinations so long as they are supported by the record. *See In re T.S.M.*, 71 A.3d at 267.

- 8 -

In our review, we conclude that these findings were supported by the record. Regarding the children's significant needs, the court heard expert testimony from Ellie Williams, the executive director and mental health therapist at EquiTeam, a service provider. Ms. Williams testified that the children were diagnosed with disorganized attachment disorder. "[Disorganized attachment disorder] doesn't meet the qualifications for full blown reactive attachment disorder [RAD], that is a very severe diagnosis, and I hesitate to give that. Disorganized attachment is just they haven't reached the level of RAD. There hasn't been sort of killing animals or severe instances like that, but they are unable or have challenges attaching to caregivers and parental figures." *See* N.T. at 171.

The reason for this diagnosis is that all of the children have experienced significant "developmental trauma." Ms. Williams explained the basis of the trauma as follows: "[W]hen there hasn't been the nurturing and the love and the care in an early childhood infancy, toddler, they believe, they start to believe when there has been neglect, 'I'm the bad person.' They have so much shame. [...] Their acting out to an extreme level, the shame, this is who we are, we are this bad and this is why we do this." *Id.* at 167. Consequently, the children displayed extreme behaviors, acted out, and refused to listen to directions. *Id.* at 157.

In order to address this misbehavior, Ms. Williams testified that she employed "didactic developmental psychotherapy techniques." *Id.* at 161. For instance, when the children are engaging in an activity in a dangerous

manner, Ms. Williams will offer to teach the children to do the activity safely. If she told them "don't do that," Ms. Williams explained that the children will be triggered and act out. By teaching them, the children lose interest in the "fun" of being dangerous. *See id.* at 159-162.

Repairing the relationship between the parents and the children necessarily means addressing the trauma. Ms. Williams testified that this would take "years and years and years." *See* N.T. at 183. Importantly, Mother would have to be "healthy and regulated" before she could even begin that work. *Id.*

Susan Scott, another expert therapist with EquiTeam testified that the children experienced trauma as a result of Mother placing the older two siblings in the caregiver role to the two youngest siblings, while Mother's substance abuse and domestic violence permeated the home. *See id.* at 212. While the children have done well with therapy, aided by the support of their respective foster parents, the children's progress will not continue unless they achieve security and stability through permanency. *See id.* at 212.

While Ms. Scott and Ms. Williams focused primarily on the children's therapy, Ms. Suzanne Kearse – a family therapist with Catholic Charities – worked with Mother to address her therapeutic goals. *See id.* 368. Specifically, Ms. Kearse sought to help Mother's "self-esteem with relation to goal setting and planning for a sober life, identifying healthy relationships that support her sobriety, and confronting and working through strong or difficult emotions so that she can develop healthy coping skills for those emotions."

*Id.* at 369. From September 2018 through July 2019, Mother was not consistent with her therapy. At the time of the termination hearing in February 2020, Ms. Kearse described Mother's progress as "moderate," but noted it fluctuated from "minimal" to "significant" over the course of the dependency case. *Id.* at 371.

Of concern for Ms. Kearse, was Mother's inability to separate herself from Father T.L., whose influence on Mother would cause her to exercise poor judgment and regress. *See id.* at 371-372. Ms. Kearse opined further that Mother needed to learn how to process her own trauma in order to meet the children's parenting needs. *See id.* at 405; 408-409. By way of example, a few weeks prior to the termination hearing, Mother had a visit with T.L. (2014). The child evidently had a panic attack. He told the supervising therapist that he couldn't breathe because he couldn't control his emotions and anxiety. *Id.* at 425. In addition to difficulty breathing, T.L. (2014) likely broke out in hives. *Id.* Mother could not de-escalate the situation to address T.L.'s needs.

These facts support the orphans' court determination. The larger concern for the court – indeed, the larger focus of Section 2511(a)(2) – was that Mother did not possess the ability to parent these children, who all have significant behavioral issues. Although Mother was inclined to learn parenting skills, she never implemented them or displayed that she understood them. Importantly, Mother was never able to progress to the point of having unsupervised visits with the children. Although Mother made some progress,

the court did not abuse its discretion by determining that the progress was not enough to overcome her inability to parent.

Having concluded the orphans' court did not abuse its discretion regarding the first prong of the termination analysis under Section 2511(a)(2), we turn to the second prong of the analysis under Section 2511(b). This section addresses the needs and welfare of the child under the standard of the best interests of the child. *See In re C.M.K.*, 203 A.3d 258, 261 (Pa. Super. 2019) (citation omitted). Specifically, Section 2511(b) provides:

> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §2511(b).

Under this prong of the termination analysis, the orphans' court determined that the children's needs and welfare would be best served by terminating Mother's rights. The court summarized those findings as follows:

> As it relates to [A.L. (born 2008)], all of the professionals involved with her indicate that at this point she needs permanency. Notably at every hearing Mother has been supposedly on the cusp of being ready. We've passed the point where she can be on the cusp of ready. She isn't ready and [A.L. (born 2008)] can't wait anymore. She is in a

stable foster home where she is doing well. She is in a school where she is doing well. She has progressed in her counseling, and she needs to know that her situation is permanent. Therefore, it is clearly in her best interests at this time to terminate Mother's parental rights.

Turning next to [A.L. (born 2010)], she while not having been in this home long, has been there long enough that she feels safe, secure, bonded with her sister and ready to move forward in her current setting. She also has progressed in counseling. Notably while Mother and Father have had an opportunity to participate in counseling, that has not allowed them any meaningful way to help [A.L. (2010)] address the trauma in any way that would allow her to feel safe and move forward in the care of either parent.

As it relates to [A.L. (born 2013)], the only person currently capable of addressing her current behaviors appears to be the foster parents. The [c]ourt has some concerns and would certainly like to support the foster parents with additional evaluations, which are underway. It is clear, however, that neither parent can handle those behaviors. Therefore, it is in her best interests to terminate parental rights.

As it relates to [T.L. (born 2014)], his strongest bond at this point is most likely with his siblings. He also needs permanency. He has been in a stable foster home and needs to know that he will be able to stay there. Therefore, it is in the best interests of each of the children for Mother's parental rights to be terminated.

T.C.O. 1, at 10-11.

Immediately we note that none of Mother's arguments adequately address the court's determinations under this second prong of the termination analysis. In her Brief, Mother starts by reiterating that she has been cooperative with the family service plans. ***See generally*** Mother's Brief at 45-49. However, the focus under Section 2511(b) is not on a parent's actions,

but on the needs and welfare of the children. **See In re L.M.**, 923 A.2d at 511.

Next, Mother's contends the court erred by relying upon the expert testimony of Dr. Jonathan Gransee, who prepared various parenting assessments. **See** Mother's Brief at 49-54; **see also** Agency's Exhibits 11-14. Specifically, Mother attacks the reliability of Dr. Gransee's testimony and reports, arguing that Dr. Gransee based his opinions on collateral information he received from the Agency, and that he was not prepared during the termination hearing. **See** Mother's Brief at 49-50. For support, Mother cites the court's "preemptive comment" to the parties that they treat Dr. Gransee with professional courtesy, because York County has had difficulty obtaining professionals to conduct evaluations due to "some attorneys [being] overly aggressive." **See** Mother's Brief at 50; **see also** N.T. at 274.[4] Mother concludes that Dr. Gransee was "not an expert witness giving an unbiased assessment." **See** Mother's Brief at 51.

We do not find Mother's argument persuasive or relevant. Indeed, we are inclined to find waiver. Mother stipulated Dr. Gransee's four parenting assessments would be admitted in lieu of specific testimony, and she also stipulated to his qualifications as an expert. **See** N.T. at 270. Although Mother

---

[4] The orphans' court clarified to Mother's counsel: "This has not been an issue with you…but I just want to make the comment generally since we don't have a lot of people who are currently willing to perform capacity evaluations for us." **Id.**

questioned Dr. Gransee about the underlying information used in his reports, not once did she object during Dr. Gransee's abbreviated testimony.

Moreover, Dr. Gransee's testimony and reports are not particularly relevant to the analysis under Section 2511(b). They largely concern Mother's parenting ability, as opposed to the best interests of the children. For instance, Dr. Gransee conceded that he did not observe Mother with any of the children, but he testified that "wasn't the point of the evaluation." N.T. at 286. Dr. Gransee explained that his reports concerned parenting capacity; they were not assessments of parental bonding. *Id.* at 286; 288. Indeed, the orphans' court did not appear to rely upon this testimony or evidence when concluding that the Agency met its burden under Section 2511(b).

Therefore, we need not find waiver outright, because Mother's arguments under Section 2511(b) are irrelevant to our analysis of this prong. Notably, Mother presents no argument concerning the court's bonding determinations. Although the bond analysis is "a major aspect of the Section 2511(b) best interest analysis, it is nonetheless only one of many factors to be considered by the [orphans'] court when determining what is in the best interest of the child." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted). The question is not whether a bond exists, but whether termination would destroy a necessary and beneficial bond. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). Still, "in cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re Q.R.D.*, 214 A.3d 233, 243 (Pa. Super. 2019) (citation omitted).

Even if a bond between Mother and the children existed, it is clear any detriment in severing that bond will be outweighed by the benefit of achieving stability for the children. Ms. Williams opined that termination would be in the children's best interests because "[t]he extent of their trauma [is] so severe and there needs to be stability for the children to be able to work through that." *See* N.T. at 170.

In sum, we conclude the court did not abuse its discretion when it found termination best served the children's needs and welfare.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/19/2020

- 16 -